UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PEGGY S. LEGRANDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08-cv-02047 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Peggy LeGrande brought this negligence action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674. LeGrande alleges that the defendant United States was responsible for injuries which she suffered while working as a flight attendant on Southwest Airlines Flight 2745 ("Flight 2745") when Flight 2745 hit turbulence. LeGrande alleges that Federal Aviation Administration ("FAA") Air Traffic Controllers negligently failed to warn the plane's pilot that severe turbulence was forecasted. Both LeGrande and the United States move for summary judgment. For the following reasons, LeGrande's motion for summary judgment is denied and the United States' motion for summary judgment is granted.

### I. BACKGROUND

LeGrande alleges that while she was working as a flight attendant on Flight 2745 on February 10, 2006, she fell when the airplane hit severe turbulence resulting in her suffering physical injuries. (Am. Compl. ¶ 4, 5, 9 and 10.)[1] After the FAA rejected LeGrande's administrative claim, LeGrande brought this FTCA claim against the United States.

---

[1] For the purposes of this opinion, the following citation conventions will be observed: Citations to Plaintiffs' Amended Complaint (Doc. 45) will appear as Am. Compl. __. Citations to Plaintiff's Statement of Material Facts (Doc. 64) will appear as Pl.'s Stmt. ¶ __. Citations to Defendant's Statement of Material Facts (Doc.

## A. Factual Background

### 1. Overview of FAA Air Traffic Control Responsibilities Relating to Weather

The FAA provides air traffic control services to airplanes. The Cleveland Air Traffic Control Center ("Cleveland Center"), which was providing services for Flight 2745 at the time of the turbulence,[2] is responsible for planes flying at certain altitudes over a six-state area that is divided into fifty-six sectors. (Def.'s Stmt. ¶ 36.)[3] Air Traffic Control's ("ATC") primary purposes are to: "(1) prevent a collision between aircraft operating in the system, (2) to organize and expedite the flow of traffic, and (3) to provide support for national security and homeland defense." (*Id.* ¶ 37.) Air traffic controllers may also provide lower-priority services, such as broadcasting certain specific weather information, depending on controllers' workload and other factors. (*Id.*) Air traffic controllers communicate with pilots only via radio. (*Id.* ¶ 38.)

As part of an interagency agreement between the FAA and the National Weather Service ("NWS"), the NWS has Center Weather Service Units ("CWSU") at FAA centers. (Pl.'s Stmt. ¶¶ 35-37.) CWSU meteorologists provide weather information for ATC by issuing various weather products, including a Central Weather Advisory ("CWA") and Meteorological Impact

---

61) will appear as Def.'s Stmt. ¶ __. Citations to the declaration of Andrew Behary, Def.'s Ex. J (Doc. 60-10), will appear as Behary Decl. ¶ __. Citations to the deposition of Andrew Behary, Def.'s Ex. K (Doc. 60-11) and Pl.'s Ex. N (Doc. 63-13), will appear as Behary Dep. at __. Citations to the declaration of Thomas Janus, Def.'s Ex. M (Doc. 60-13), will appear as Janus Decl. ¶ __. Citations to the deposition of Donald Leonard, Def.'s Ex. Y (Doc. 68-6) and Pl.'s Ex. M (Doc. 63-12), will appear as Leonard Dep. at __. Citations to the deposition of Walter Miga, Def.'s Ex. G (Doc. 60-7) and Pl.'s Ex. G (Doc. 63-7), will appear as Miga Dep. at __. Citations to the deposition of Richard Burgess, Def.'s Ex. E & EE (Doc. 60-6 & 73-2), will appear as Burgess Dep. at __. Citations to the deposition of Thomas Moberg, Def.'s Ex. C (Doc. 60-3) and Pl.'s Ex. F (Doc. 63-6), will appear as Moberg Dep. at __. Citations to the Expert Report of William Turner, Def.'s Ex. W (Doc. 68-4), will appear as Turner Rep at __. Citations to the deposition of Scott Fitzgerald, Def.'s Ex. D (Doc. 60-4) and Pl.'s Ex. A (Doc. 63-1) will appear as Fitzgerald Dep. at __. Citations to all other record materials will be referenced by their docket number.

[2]     The parties did not identify the air traffic controllers on duty on February 10, 2006, or identify the controllers that communicated with Flight 2745.

[3]     Unless otherwise noted, the Defendant's and Plaintiff's statements of facts cited in this opinion are undisputed. Although LeGrande argues that the United States failed to receive leave from the court to submit more than eighty statements of facts, the United States' Motion for Summary Judgment and Motion to Exceed the Page Limit also requested that it be permitted to exceed the number of facts allowed in the Statement of Material Facts, Local Rule 56.1(a)(3). (*See* Def.'s Mot. for Summ. J. (Doc. 59) at 1.)

Statement ("MIS"). (NWS Instructions 10-803, Def.'s Ex. N (Doc. 60-14), at 7.) CWSU meteorologists provide weather briefings for supervisors at Cleveland Center at the beginning of the 7:00 AM and 3:00 PM shifts. (Pl.'s Stmt. ¶ 40.) After the CWSU briefings, the supervisors then generally brief the controllers. (*Id.* ¶ 42; Leonard Dep. at 21-22.)

Air traffic controllers are trained to read the products issued by CWSU meteorologists that are printed at the controller's station on General Information Strips; controllers are not trained to forecast or predict weather events or provide pilots with any weather-related information not contained on an Information Strip. (Def.'s Stmt. ¶¶ 44, 50.) At Cleveland Center, the controllers read the information contained on the General Information Strip out loud over the radio one time so that all pilots on the frequency can hear it, and then place the strip in an "out box" indicating it has been read on the frequency. (Def.'s Stmt. ¶ 50.) If the information strip includes certain significant weather, the controller, after reading it, informs pilots that more detailed weather information can be heard on the Hazardous Inflight Weather Advisory Service ("HIWAS"). (*Id.*) HIWAS is broadcast on a different radio frequency and is dedicated solely to disseminating hazardous weather information. (*Id.*)

According to the Air Traffic Control Handbook, FAA Order 7110.65P (hereinafter "ATC Handbook"), "Controllers are required to be familiar with the provisions of this order that pertain to their operational responsibilities and to exercise their best judgment if they encounter situations that are not covered by it." (ATC Handbook, Pl.'s Ex. R (Doc. 63-17) and Def.'s Ex. CC (Doc. 68-10), § 1-1-1.) The ATC Handbook states that Controllers "shall advise pilots of hazardous weather that may impact operations within 150 [nautical miles] of their sector or area of jurisdiction. . . . The broadcast is not required if aircraft on [the controller's] frequency(s) will not be affected." (*Id.* § 2-6-2). The hazardous weather information contained in a HIWAS

3

broadcast includes an Airmen's Meteorological Information ("AIRMET"), Significant Meteorological Information ("SIGMET"), Convective SIGMET, Urgent Pilot Weather Reports ("UUA"), and CWAs. (*Id.* § 2-6-2.) Air traffic controllers at Cleveland Center do not do HIWAS broadcasting. (*Id.*; Behary Dep. at 50.) In contrast to the FAA's ATC, the FAA's Flight Service Stations, which are run by an independent contractor, have the primary purpose of providing weather information to pilots operating in the air traffic system. (*See* NWS Instructions 10-803 at 4-5; *see also* Turner Rep. at 6.) Personnel at Flight Service facilities are trained in the weather briefing process and provide the majority of weather information to pilots. (Turner Rep. at 6.)

NWS Weather products are incorporated into a weather package given to the pilots and flight dispatcher prior to a flight. (Pl.'s Stmt. at 23; Miga Dep. at 130.) An airline's flight dispatcher is required to keep pilots apprised of weather conditions both before and during a flight, including giving the pilots all available weather reports and forecasts of weather phenomena "that may affect the safety of flight." (Def.'s Stmt. ¶ 9.)

Because turbulence occurs and changes extremely rapidly and requires the subjective analysis of multiple sources of data, it is extremely difficult to predict and forecast. (Def.'s Stmt. ¶¶ 41, 70.) Accordingly, there is no weather radar that displays turbulence, and a meteorologist generally knows if turbulence is actually occurring only based on reports from pilots. (*Id.* ¶¶ 43, 71.) Pilots report turbulence, as well as other weather conditions, to ATC in reports called "PIREPS."

### 2. CWAs, MISs, and PIREPS

Three of the weather products used by the FAA, and relevant to this case, are CWAs, MISs, and PIREPS. While CWAs and MISs are issued by CWSU meteorologists, PIREPS are

4

reports of bad weather conditions from pilots. A CWA is an "aviation weather warning for conditions meeting or approaching national in-flight advisory (AIRMET, SEGMET or SIGMET for convection) criteria . . . [it] is primarily used by air crews to anticipate and avoid adverse weather conditions in the en route and terminal environments." (NWS Instructions 10-803 at 11.) A CWA is specifically tailored to pilots and has a narrow focus, warning of specific weather issues for approximately two hours after its issuance. (Def.'s Stmt. ¶ 76.) Meanwhile, an MIS is an "unscheduled flow control and flight operations planning forecast . . . for personnel at [ATC centers] responsible for making flow control-type decisions . . . enabl[ing] ATC facility personnel to include the impact of specific weather conditions in their flow control decision making." (NWS Instructions 10-803 at 10; *see also* NWS Product Description for MIS, Def.'s Ex. S (Doc. 60-19) at 1.) The FAA uses an MIS to predict traffic volume and flow so that the FAA can properly staff air traffic control positions; each MIS specifically states that it is "FOR ATC PLANNING PURPOSES ONLY." (Def.'s Stmt. ¶ 56.) According to the NWS's product description, an MIS should be issued for certain conditions, including moderate or greater turbulence, if "in the forecasters [sic] judgment, the condition[] . . . will adversely impact the flow of air traffic within the Air Route Traffic Control Center area of responsibility" and "the forecast lead time (the time between issuance and onset of a phenomenon), in the forecasters [sic] judgment, is sufficient to make issuance of a CWA unnecessary or premature." (NWS Product Description for MIS at 1.) Although CWAs and MISs are both publicly available in real time on the internet, a CWSU meteorologist creates a CWA intending it will be used by a pilot but creates an MIS with the intention it will be used internally and not by pilots. (Def.'s Stmt. ¶¶ 66, 72, 76; Janus Decl. ¶¶ 5-7.)

When a CWSU meteorologist issues a CWA, the controllers make a one-time broadcast to advise that more information can be obtained through HIWAS or a Flight Service Station. (Def.'s Stmt. ¶ 78.)  In contrast, a CWSU meteorologist's MIS is not printed on a General Information Strip, is not read to pilots by controllers, and pilots are not generally familiar with what an MIS weather product is.  (*Id.* ¶¶ 58, 61; Behary Decl. ¶ 21.)  The FAA Facility Operation and Administration Order does not require any specific action after a CWSU meteorologist issues an MIS.  (Defs,' Stmt. ¶ 86; FAA Order 7210.3T, Def.'s Ex. R (Doc. 60-14).)  The information contained in an MIS is not listed as a type of hazardous weather information that is to be included in a HIWAS broadcast.  (*See* ATC Handbook § 2-6-2.)  Additionally, Southwest Airlines has not authorized the use of an MIS for flight operations. (Def.'s Stmt. ¶ 59.)

PIREPS are put into the ATC computer system and broadcast over relevant controllers' frequencies to other planes.  (*Id.* ¶ 40.)  Additionally, PIREPS are immediately dispersed throughout the aviation weather system to airlines and pilots and are also made freely available to anyone over the internet.  (*Id.* ¶ 46-47.)  Cleveland Center receives hundreds to thousands of PIREPS every day.  (*Id.* ¶ 39.)  In general, PIREPS provide useful weather data for 30 to 60 minutes, unless pilots continue to report the same weather condition in the same location.  (*Id.* ¶ 52.)  Controllers do not read old PIREPS over and over again on a frequency because the information is available from other sources, such as an airline's dispatcher or an FAA Flight Service Station, and the controller's radio frequency would be unusable for controlling air traffic. (*Id.* ¶¶ 53-54.)  FAA Order 7110.10R discusses when Flight Service personnel (as opposed to ATC personnel) should solicit PIREPS, and how PIREPS should be classified and handled.

(FAA Order 7110.10R, Pl.'s Ex. S (Doc. 63-18) §§ 9-2-10 – 9-2-12.)  PIREPS reporting severe or extreme turbulence should be classified as urgent.  (*Id.* § 9-2-11.)

### 3. FAA Weather Reports prior to Flight 2745

Cleveland Center's CWSU meteorologist Thomas Janus, an NWS employee, issued three MISs and one CWA on February 10, 2006.  (Defs. Stmt. ¶ 62.)  In MIS 02 and 03, Janus "advised the Traffic Management Unit that frequent moderate to isolated severe turbulence might develop over a large portion of Cleveland Center's airspace during the next 12 hours" at altitudes of 17,000 to 27,000 feet in MIS 02 and 17,000 to 32,000 feet in MIS 03.  (Janus Decl. ¶ 18; MIS 02 and MIS 03, Pl.'s Ex. Y (Doc. 63-24).)  Both MIS 02 and 03 state "FOR ATC PLANNING PURPOSES ONLY."  (MIS 02 and MIS 03, Pl.'s Ex. Y.)  Janus issued MIS 02 at 2:42 PM Eastern Standard Time ("EST"), (1942 Coordinated Universal Time ("UTC")[4] and issued MIS 03 at 9:06 PM EST (0206 UTC on February 11th).  (Janus Decl. ¶ 18; 2/10/2006 CWSU Log, Pl.'s Ex. T (Doc. 63-19).)  After receiving a PIREP of severe turbulence at 32,000 feet, Janus issued a CWA at 8:31 PM EST (0131 UTC on February 11th) "advising pilots of moderate to occasional severe turbulence for the area east of Cleveland Airport."  (Janus Decl. ¶ 18; *see also* Def.'s Stmt. ¶ 79.).)  Janus believed that the weather system was moving east, away from Cleveland.  (Def.'s Stmt. ¶ 80.)

### 4. Flight 2745

Flight 2745 took off from Cleveland Airport at 9:40 PM EST, (0240 UTC on February 11th), en route to Chicago Midway Airport.  (Moberg Dep. at 50-51.)  Several minutes into the flight the pilots instructed the flight attendants to take their seats after a light to moderate bump.

---

[4]    The parties and witnesses refer to the time of events relating to Flight 2745 in "Zulu," "GMT" (Greenwich Mean Time) and "UTC," interchangeably, and also in EST.  For the purposes of this opinion, the court will refer to time in EST and UTC.

(Pl.'s Stmt. ¶ 14.)  Within five seconds of the pilots' announcement, at 9:58 PM EST (0258 UTC on February 11th), Flight 2745 experienced severe turbulence for about fifteen seconds.  (*Id.* ¶ 15.)  During this turbulence, LeGrande was tossed around the cabin and suffered the alleged injuries.  (*Id.* ¶ 16.)  A 9:58 PM EST (0258 UTC on February 11th) PIREP, made by the pilots of Flight 2745, reflects Flight 2745's encounter with severe turbulence.  (Def.'s Stmt. ¶¶ 2-3.)  A 10:05 PM EST PIREP for severe turbulence from another flight was broadcast to the crew of Flight 2745 approximately seven minutes later.  (*Id.* ¶ 4.)

Prior to Flight 2745, the plane's pilots had just completed a flight from Chicago, Illinois to Cleveland, Ohio which had experienced light to moderate turbulence.  (Def.'s Stmt. ¶ 14; Pl.'s Stmt. 7.)  Approximately thirty minutes prior to departure, Flight 2745's pilots received a weather package relating to the scheduled flight, which contained weather forecasts, Northwest Airlines Turbulence Plots, SIGMETS, AIRMETS, and PIREPS.  (Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 23.)  Although the weather package did not include any information about severe turbulence for the flight path at 20,000 feet, the weather package contained a private meteorologist's forecast of moderate turbulence for Flight 2745's flight path at 20,000 to 26,000 feet.  (Pl.'s Stmt. ¶ 19; Def.'s Stmt. ¶ 18; Fitzgerald Dep. at 110-113)  There were a number of PIREPS included in the weather package, including a PIREP at 6:18 PM EST (2318 UST) (hereinafter "2318 PIREP"), in which an Embraer 145 reported severe turbulence between the altitude of 20,000 and 22,000 feet over Windsor, Ontario.  (Pl.'s Stmt. ¶ 64; Southwest Airlines Weather Package for Flight 2745, Def.'s Ex. I (Doc. 60-9).).  A 6:45 PM EST (2345 UTC) PIREP (hereinafter "2345 PIREP") from a Lear Jet reporting severe turbulence between 19,000 and 21,500 feet over Boiler VOR (Pl.'s Stmt. ¶ 65), and a 8:10 PM EST (0110 UTC) PIREP (hereinafter "0110 PIREP") from a Canadian Regional Jet reporting moderate to severe

turbulence from 20,000 to 21,000 feet over Portland, Indiana (Pl.'s Stmt. ¶ 71), were not included in the Southwest weather package because they were not considered pertinent weather information for Flight 2745 and were not in Cleveland Center's airpsace. (Def.'s Stmt. ¶¶ 30, 35.)

Southwest Airlines flight dispatcher Walter Miga planned Flight 2745 for an altitude of 30,000 feet, but the pilots decided to fly at 20,000 in order to avoid the turbulence they experienced on the previous flight from Chicago to Cleveland. (Def.'s Stmt. ¶¶ 5-6; Fitzgerald Dep. at 65-66.) The pilots received clearance from ATC to fly at 20,000 feet, but did not inform Miga that they were going to fly at 20,000 feet. (*Id*. at 6.) Miga had access to all NWS products on the internet. (Def.'s Stmt. ¶ 69.) Miga testified that he complied with his obligation to provide the crew of Flight 2745 with all pertinent weather information. (*See* Pl.'s Stmt. ¶ 25; Miga Dep. at 49, 145-47.) Miga also testified that he would have "strongly advised against" flying at 20,000 feet had the pilots contacted him prior to the flight. (Miga Dep. at 76.)

## B. Procedural Background

In her original complaint, LeGrande alleged that Flight 2745 encountered severe turbulence at approximately 9:15 PM Central Standard Time (10:15 PM EST), and that two PIREPS reported severe turbulence at an altitude of 20,000 feet prior to Flight 2745's encounter. (*See* Compl. (Doc. 1) ¶¶ 6, 10-11.) However, Flight 2745 actually encountered the severe turbulence at 8:58 PM CST (9:58 EST), and thus the first PIREP referenced in the complaint was actually from Flight 2745 itself, and the second PIREP occurred after Flight 2745 hit the turbulence. (Def.'s Stmt. ¶¶ 2-4.) After the close of discovery, the court allowed LeGrande to amend her complaint to remove references to the two PIREPS and to remove the allegation that

the turbulence occurred at 9:15 PM EST. (*See* Am. Compl. ¶ 6-10; *see also* Pl.'s Mot. for Leave to File First Am. Compl. (Doc. 38) at 4-6.)

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden, even if the other party has the burden of proof at trial. *Id.* at 323. The moving party can satisfy its burden either by presenting evidence that negates the opponent's claims, or demonstrating that the opponent will be unable to meet its burden at trial because of an absence of evidence on an essential element. *Id.* at 325. If the moving party meets its burden, the burden shifts to the opponent to show that a fact is genuinely disputed, requiring the non-moving party to demonstrate that it will be able to present evidence which would permit a jury to find in its favor. *Id.* at 323-24.

All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent. Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008); *see also Bassiori v. F.B.I.*, 436 F.3d 712, 721 (7th Cir. 2006) (applying the same standard to cross-motions for summary judgment). The evidence presented at this stage must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), or it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in

10

evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III. ANALYSIS

LeGrande contends that she is entitled to summary judgment on the issue of the United States' liability because the FAA was negligent in failing to report warnings of severe turbulence to Flight 2745's pilots.  Meanwhile, the United States argues that the court should grant summary judgment in its favor because LeGrande cannot satisfy the duty, breach, or causation elements required for a negligence action under Ohio law.  The United States also contends that it is entitled to judgment under the FTCA's discretionary function exception.  Because the court agrees with the United States that LeGrande has not demonstrated that she could present evidence to a jury showing that the United States breached a duty owed to LeGrande, the other issues raised by the parties need not be addressed. [5]

The FTCA allows plaintiffs to bring actions against the United States in federal court for "personal injury or death caused by the negligent or wrongful act or omission of an employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with

---

[5]     The court notes that under the FTCA's discretionary exception, 28 U.S.C. § 2680(a), the United States cannot be held liable for a discretionary policy judgment.  *Collins v. United States*, 564 F.3d 833, 840 (7th Cir. 2009) (holding that, under the discretionary-function exception, the FAA could not be held liable for negligence for its determination not to install automated radar at an airport because the decision was a discretionary policy judgment). As will be discussed below, based on the FAA's and NWS's established policies, practices and procedures concerning its weather service system, MISs, and the forecasts contained therein, are for internal FAA staffing purposes only and are not intended to be disseminated to pilots.
    Because LeGrande specifically states that she is not challenging FAA and NWS discretionary judgments concerning the weather service system (Pl.'s Opp'n Mem. at 31 ("Plaintiff is not 'inherently' challenging the FAA's aviation weather service system.")), the court need not decide if the FAA and NWS policies regarding MIS dissemination fall within the FTCA's discretionary exception.  However, it is likely that the FAA's and NWS's determination of how to utilize different weather products, including which ones to require controllers to disseminate to airline pilots and which ones are for internal planning purposes only, falls within the FTCA's discretionary-function exception.  *See United States v. Varig Airlines*, 467 U.S. 797, 819-20 (1984) ("Such decisions require the [FAA] to establish priorities for the accomplishment of its policy objectives by balancing the objective sought to be obtained against such practical considerations as staffing and funding.").

the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The parties do not dispute that Ohio law applies because the events that gave rise to this action occurred in Ohio: the plaintiff alleges that the FAA employees were located at the Cleveland Air Route Traffic Control Center in Oberlin, Ohio, and that Flight 2745 was in Cleveland Center's airspace when the turbulence occurred. (*See* Am. Compl. ¶¶ 6-7.) Under Ohio choice-of-law provisions, the law of the place where the injury occurred will govern a tort action unless another state has a more significant relationship to the action. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984). Because the injury and the FAA's alleged negligent conduct took place in Ohio, no other state has a more significant relationship than Ohio and thus Ohio tort law applies.

Under Ohio law, a plaintiff asserting a claim of negligence must prove (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) that defendant's breach is the proximate cause of the plaintiff's injury. *Wallace v. Ohio Dept. of Commerce*, 773 N.E.2d 1018, 1025 (Ohio 2002); *see also Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989). As will be discussed below, although (A) the FAA air traffic controllers had a duty to disseminate certain weather related information to Flight 2745, they (B) did not breach this duty as to any CWAs or PIREPs. Furthermore, (C) the controllers did not have a duty to disseminate MISs or the information contained therein.

## A. Duty to Disseminate Certain Weather Information

The existence of a duty in a negligence action is a question of law for the court. *Mussivand*, 544 N.E.2d at 270. The existence of a duty "depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace*, 773 N.E.2d at 1025. Generally, the duty of due care "is that degree of care which an

ordinarily reasonable and prudent person exercises, or is accustomed to exercising, under the same or similar circumstances." *Mussivand*, 544 N.E.2d at 270.

Negligence actions can be based on either "acts of omission or acts of commission;" an act of omission involves the "failure to do an act that a person is under a duty to do and that a person of ordinary prudence would have done under the same or similar circumstances, or the failure to take action to protect another from harm." *Asad v. Continental Airlines, Inc.*, 328 F. Supp. 2d 772, 782 (N.D. Ohio 2004) (holding that the issue of whether or not a defendant airline breached its duty of due care by failing to transfer a pregnant employee from a flight precluded summary judgment for the defendant on plaintiff's negligence claim). Ohio law generally does not require that a person take an affirmative action to aid or protect another, unless there is a "special and definite" relationship between the parties. *Id.* (citing *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 673 N.E.2d 1311, 1319 (Ohio 1997)). However, the government must exercise reasonable care in performing responsibilities it has assumed and "conform to the standards which it sets for itself." *Dreyer v. United States,* 349 F. Supp 296, 305 (N.D. Ohio 1972), *aff'd sub nom. Freeman v. United State*s, 509 F.2d 626 (6th Cir. 1975); *see also Ingham v. Eastern Air Lines, Inc.* 373 F.2d 227, 236 (2d Cir. 1967) ("It is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently.").

In aviation cases, courts have held that an FAA controller owes a duty of reasonable care to an aircraft, passengers, crews, and cargoes in the performance of the controller's duties; these duties are concurrent with an airplane pilot's duty of due care. *Davis v. United States*, 824 F.2d 549, 550 (7th Cir. 1987) ("While general negligence law applies to airplane tort cases, . . . the

standard of due care is concurrent, resting upon both the airplane pilot and ground personnel." (quoting *Spaulding v. United States*, 455 F.2d 222 (9th Cir. 1972)); *see also Freeman*, 509 F.2d at 629 (holding that a controller's duty extended to parachutists jumping out of the plane); *Somlo v. United States*, 416 F.2d 640, 647 (7th Cir. 1969) (holding that "the FAA controllers fully performed their duty to the plaintiffs" based on what they "knew and should have known" about a plane's lack of de-icing equipment). In *Freeman*, the Sixth Circuit held that because air traffic control had been notified that a flight was going to involve a group of parachutists jumping at high altitude, the air traffic controller knew or should have known that any mistake pertaining to the plane's position could be disastrous. *Freeman*, 509 F.2d at 629. Thus, the court held that the controller owed a duty to the jumpers to exercise due care under Ohio law. *Id.*

FAA air traffic controllers' duties include giving "all the information and warnings specified in [their] manuals, and in certain situations [they] must give warnings beyond the manuals." *Davis*, 824 F.2d at 550. These duties include reporting certain weather conditions, as specified in the ATC manual. *See Worthington v. United States*, 21 F.3d 399, 406-07 (11th Cir. 1994) (holding that FAA controllers' failure to provide "accurate and timely information" about foggy weather conditions when an airplane pilot approached the landing strip caused the spatial disorientation of the pilot, which was the type of harm the controllers should have expected); *see also Ingham*, 373 F.2d at 234 ("The issue . . . is not whether the government had a duty to [report weather condition] information, but rather what was the scope of that duty."). Air traffic controllers are "required to do what a reasonable air traffic controller of their experience and training would have done under the totality of the circumstances." *Kelley v. United States*, No. 1:08-cv-31, 2009 WL 1439896 at *5 (E.D. Va. Mar. 26, 2009) (holding that an air traffic

controller's failure to report weather conditions from another FAA location to a plane's pilot was not negligent); *see Mussivand*, 544 N.E.2d at 270.

Here, the ATC Hanbook in use on February 10, 2006 states that the "primary purpose of the ATC system is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic." (Air Traffic Control Handbook § 2-1-1.) Controllers are required to provide additional, lower-priority services, such as broadcasting certain specific weather information, depending on their workload and other factors. (Def.'s Stmt. ¶ 37.) The "provision of additional services is not optional on the part of the controller, but rather is required when the work situation permits." (ATC Handbook § 2-1-1.) Controllers are required to "Become familiar with pertinent weather information when coming on duty, and stay aware of current weather information needed to perform ATC duties." (*Id.* § 2-6-1.) "Furthermore, controllers shall advise pilots of hazardous weather that may impact operations within 150 [nautical miles] of their sector or area of jurisdiction."[6] (*Id.* § 2-6-2.) Thus, the FAA air traffic controllers had a legal duty to relay certain weather information to Flight 2745's pilots in accordance with the ATC handbook, and in accordance with general ATC practice and procedure.

---

[6] The United States argues that ATC Handbook § 2-6-2 is inapplicable to this case because it concerns HIWAS broadcasts which the controllers at Cleveland Center do not handle. (*See* Def.'s Resp. to Pl.'s Stmt. of Material Facts ¶ 54.) Although it appears that the United States may be correct that § 2-6-2 applies to HIWAS broadcasts, the section does not distinguish between a "HIWAS" controller and "non-HIWAS" controller. (*See* ATC Handbook § 2-6-2 (a)-(b).) Although there was testimony in the record that Cleveland Center does not "do" HIWAS broadcasts, (Behary Dep. at 49-50), the record is unclear as to whether or not § 2-6-2 applies to ATC Controllers. As the court must make all inferences in LeGrande's favor in granting the United States motion for summary judgment, *Wis. Cent. Ltd*, 539 F.3d at 756, the court will assume that § 2-6-2 applies to the controllers at Cleveland Center.

**B. No Breach of Duty to Disseminate CWA and PIREPS**

The Cleveland Center controllers did not breach the standard of care in performing their legal duties to disseminate weather in relation to Flight 2745 because there is no evidence that they knew of, or should have known of, severe turbulence in Flight 2745's path.

*Ingham* provides an example where an FAA controller breached a legal duty to an airline pilot by not providing accurate information that the controller knew, or should have known. *Ingham*, 373 F.2d at 233. The FAA approach controller in *Ingham* gave an erroneous report of existing weather to the pilots of an Eastern Air Lines flight which crashed while attempting to land. *Id.* Prior to the flight's landing approach, the FAA approach controller informed the pilots that visibility was one mile, even though the FAA approach controller's coordinator had previously advised the controller that visibility had reduced to three-quarters of a mile. *Id.* The FAA's Air Traffic Control Procedures Manual required that, when "ceiling and/or visibility is reported as being at or below the highest 'circling minima,' approach control facilities must transmit "a report of current weather conditions, and subsequent changes, as necessary . . . at the time of the first radio contract or as soon as possible thereafter." *Id.* Relying on the "as necessary" language of the manual, the Second Circuit affirmed the district court's finding that the change in visibility was so critical and brought "existing weather conditions dangerously close to landing minimums," that it should have been reported by the FAA controller to the flight's pilots in the interests of safety. *Id.* at 235. The court stated that the approach controller should have known that the one mile visibility he reported was deceptive in light of other visibility readings, reports from the Weather Bureau, and that the controllers were aware that some pilots had executed missed approaches. *Id.*

16

Unlike *Ingham*, where the FAA approach controller was aware, or should have been, of the visibility issues but gave inaccurate visibility information, LeGrande fails to present any evidence demonstrating that the air traffic controllers at Cleveland Center knew of, or should have known of, severe turbulence in Flight 2745's flight path. LeGrande argues that the controllers were aware of the severe turbulence forecasted for Flight 2745's path because of MIS 02 and MIS 03, CWA 101, and various PIREPS reporting severe turbulence. (*See* Pl.'s Opp'n Mem. at 16-19.) However, these weather products and pilot reports did not provide a basis for Cleveland Center air traffic controllers to be aware of severe turbulence in Flight 2745's path. For reasons discussed more fully below in Section C, the forecasts contained in MIS 02 or 03 did not put the controllers on notice that severe turbulence would actually occur in Flight 2745's flight path, and the controllers did not have a duty to disseminate MIS 02 or 03 to Flight 2745.

LeGrande's contention the controllers knew of the severe turbulence in Flight 2745's path based on the CWA and PIREPS fails in light of the evidence in the record. As LeGrande's own expert witness testified, (Burgess Dep. at 61-62), CWA 101 was not pertinent to Flight 2745 because it warned of severe turbulence to the area east of Cleveland Airport.[7] (*See* Def.'s Stmt. ¶ 79.) LeGrande fails to identify which PIREPS she contends put the controllers on notice of the severe turbulence in Flight 2745's path;[8] she does not dispute the defendant's proposed fact that

---

[7] LeGrande does not dispute that all of the CWAs, PIREPS, and MISs were available online to Southwest Airline's dispatcher. (*See* Pl.'s Resp. to Def.'s Stmt. of Material Facts ("Pl.'s Resp. to Def.'s Stmt.") ¶¶ 66-69.) It is also undisputed that CWA 101 was issued at 8:31 EST, more than an hour before Flight 2745 took off. (Pl.'s Resp. to Def.'s Stmt. ¶ 79.) Thus, the pilots and Southwest's flight dispatcher had access to the CWA had it been pertinent to the flight; LeGrande does not argue that Cleveland Center failed to disseminate CWA 101 according to FAA policy, which would have involved a one-time radio broadcast of the CWA when it was issued. (*See* Pl.'s Resp. to Def.'s Stmt. ¶ 67.)

[8] LeGrande states only that "the CWSU log also shows that, prior to the accident flight, the ATC had knowledge of at least four (4) pilot reports of severe turbulence at FL 200 in the Cleveland Center area." (Pl.'s Opp'n Mem. at 19.) However, the CWSU log only lists two PIREPS. (CWSU Log, Pl.'s Ex. 5 (Doc. 71-17).) The first PIREP listed is the 2318 PIREP that was included in Flight 2745's pre-flight weather package (Def.'s Stmt. ¶ 29); the second PIREP listed resulted in Janus issuing CWA 101. (*See id.*) LeGrande's argument that there were PIREPS providing the air traffic controllers with knowledge of severe turbulence lacks any support from the record.

there were no pertinent PIREPS before Flight 2745 encountered severe turbulence.  (Pl.'s Resp. to Def.'s Stmt. ¶ 24.)  None of the PIREPS identified in the record gave the controllers notice of severe turbulence in Flight 2745's flight path.  LeGrande does not dispute that the 2345 and 0110 PIREPS were not pertinent to Flight 2745.  (Pl.'s Resp. to Def.'s Stmt. ¶ 30.)  Indeed, Southwest flight dispatcher Miga testified that there were no PIREPS pertinent to the safety of Flight 2745 that the pilots did not have.  (Miga Dep. at 123; Def.'s Stmt. ¶ 23.)  The first PIREP indicating severe turbulence in Flight 2745's flight path came from Flight 2745 itself at 9:58 PM EST (0258 UTC).  (*See* Def.'s Stmt. ¶¶ 2-3.)  Finally, LeGrande has presented no evidence that the controllers violated the ATC Handbook with regard to the CWA or PIREPS.

The FAA air traffic controllers in contact with Flight 2745 met the standard of care required of FAA air traffic controllers and did not breach their duty to give warnings for hazardous weather.  LeGrande has failed to set forth any evidence that the controllers had any information relating to severe turbulence in Flight 2745's path (other than that which was disseminated through standard FAA procedures) that an ordinary and reasonable controller would have provided to Flight 2745's crew.  Therefore, the air traffic controllers did not breach their duty to report weather information to the crew of Flight 2745.

## C.  No Duty to Disseminate the MIS Forecasts

Although the FAA air traffic controllers had a legal duty to disseminate certain weather information to Flight 2745's pilots, they did not have a legal duty to disseminate MIS 02, 03, or the information contained therein.  First, based on FAA standards and procedures, including the ATC Handbook, air traffic controllers are not responsible for disseminating an MIS or information contained in an MIS.  Unlike other weather products issued by a CWSU meteorologist, air traffic controllers do not see MISs, nor is the information from an MIS printed

onto a General Information Strip that the controllers broadcast to pilots. (Behary Decl. ¶ 21.) An MIS states that it is "FOR ATC PLANNING PURPOSES ONLY," and an MIS is used by ATC supervisors to predict traffic volume and flow so that the FAA can properly staff air traffic control positions. (Def.'s Stmt. ¶¶ 55-56.) An MIS is a forecast for "unscheduled flow control and flight operations planning" that is intended for personnel at ATC centers who are "responsible for making flow control-type decisions." (NWS Instructions 10-803, Def.'s Ex. N, at 10.) Moreover, an MIS is not listed as a weather product reporting hazardous weather that is to be included in a HIWAS broadcast. (*See* ATC Handbook § 2-6-2.) Indeed, LeGrande's own expert witness testified that, to his knowledge, air traffic controllers were not permitted to broadcast a HIWAS alert for an MIS. (Burgess Dep. at 203.) Thus, a controller's duty "to advise pilots of hazardous weather that may impact operations," does not include the information contained in an MIS. (*See* ATC Handbook § 2-6-2.) Given the standard practices of FAA air traffic controllers, even assuming the controllers knew of the information contained in MIS 02 and 03, the controllers did not have a duty to the crew of Flight 2745 to inform them of the internal forecasts.

Furthermore, LeGrande has provided no evidence demonstrating that a reasonably prudent air traffic controller would have foreseen that failing to disseminate the information contained in MIS 02 or 03 to the pilots of Flight 2745 was likely to cause any harm, as is required for a legal duty to exist. *See Wallace*, 773 N.E.2d at 1025; s*ee also Kelley,* 2009 WL 1439896 at *5. Air traffic controllers are not meteorologists or trained to forecast weather events, and thus must be made aware of hazardous weather by a weather product as listed in the ATC handbook. A CWSU meteorologist issues an MIS when "the forecast lead time (the time between issuance and onset of a phenomenon), *in the forecasters judgment* [sic]*,* is sufficient to

make issuance of a CWA *unnecessary or premature.*" (NWS Product Description for MIS at 1 (emphasis added).) LeGrande does not dispute that "turbulence occurs and changes extremely rapidly, and is difficult to predict," or that "forecasting turbulence is extremely difficult, and requires the subjective analysis of multiple sources of data." (Pl.'s Resp. to Def.'s Stmt. ¶¶ 41, 70.) Nor does LeGrande dispute that the CWSU meteorologist "relies on reports from pilots to determine if turbulence is actually occurring in the air." (*Id.* ¶ 71.)

Janus's MIS 02 and 03 forecasted that "frequent moderate to isolated severe turbulence might develop over a large portion of the Cleveland Center's airspace during [a twelve hour time span]." (Janus Decl. ¶ 18.) Janus described these forecasts as his "judgment that frequent moderate to isolated spots of severe turbulence might *possibly* develop over the next 12 hours." (*Id.* ¶ 19 (emphasis added).) The MISs were broad, internal forecasts indicating the potential for isolated severe turbulence to occur in over 10,000 feet of vertical airspace over a twelve hour span. Because Janus, the CWSU meteorologist, did not believe that the possibility of severe turbulence warranted issuing a weather product that would be disseminated to pilots, a reasonable air traffic controller, with no meteorological training, would not have warned pilots of the possibility for isolated severe turbulence. Additionally, given that the MIS forecast covered a twelve-hour time span and a very large amount of airspace, it would be extremely burdensome for air traffic controllers to warn every potentially affected flight of the potential for isolated severe turbulence.[9] Finally, LeGrande admits that Southwest airlines has not authorized the use of an MIS for flight operations, and that Flight 2745's captain, Thomas Moberg, was not familiar with an MIS weather product. (Pl.'s Resp. to Def.'s Stmt. ¶¶ 58, 59.)

---

[9] As a practical matter, air traffic controllers read weather products over the radio only one time. (Def.'s Stmt. ¶ 50.) Requiring a controller to inform every flight potentially affected by a MIS forecast over a twelve-hour span is likely to interfere with the controller's primary responsibilities. Additionally, warnings for speculative forecasts could decrease the effectiveness of other weather products with more urgent and pertinent weather information.

The Seventh Circuit has previously implied that a Flight Service Station weather briefer was required to provide an MIS to a single-engine plane's pilot in the pre-flight weather briefing. *See Spurgin-Dienst v. United States*, 359 F.3d 451, 455 (7th Cir. 2004) ("Of course, FAA personnel committed errors. For example, Gilpin [a Flight Service Station weather briefer] failed to provide the Area Forecast (FA) and the Meteorological Impact Statement (MIS) to Sanders [the pilot] which contained information about icing conditions."). In *Spurgin-Dienst*, the Court upheld the district court's finding that FAA personnel's failure to provide certain weather information was not the proximate cause of a plane's crash because, even if the pilot had the information, it was unlikely that the pilot would have changed his course since he already knew he was flying into icy conditions. *Id.* The appellate court did not explain why the MIS should have been provided to the pilot, and it did not address FAA and NWS policies regarding MIS dissemination. *See id.*[10] In any case, there are substantial differences between the responsibilities of a Flight Service Station weather briefer, at issue in *Spurgin-Dienst*, and the responsibilities of an FAA air traffic controller, at issue here. Unlike ATC, Flight Service Stations ("FSS") have the primary purpose of providing weather information to pilots operating in the air traffic system and FSS personnel are trained in weather briefing. (Turner Rep. at 6.) Based on the evidence in this record, ATC controllers did not have a duty to provide pilots with information from an MIS.

Even if the controllers were aware of the forecasts contained in MIS 02 and 03, the forecasts were not created with the intention that they be disseminated to controllers or to pilots, nor did they contain information specific enough to be useful to pilots. Nor was it FAA policy or

---

[10] The district court did not mention MISs in its opinion. *See Bauer v. United States*, 289 F. Supp. 2d 944 (N.D. Ill. 2002).

21

practice to broadcast the information contained in an MIS to pilots. Thus, the controllers did not have a duty to disseminate MIS 02 or 03 to the pilots of Flight 2745.

## IV. CONCLUSION

For the foregoing reasons, the FAA, through its air traffic controllers, was not negligent in their dissemination of weather information to Flight 2745. LeGrande's motion for summary judgment is denied. The United States motion for summary judgment is granted.

ENTER:

_____/s/_____

JOAN B. GOTTSCHALL
United States District Judge

DATED: March 31, 2011